UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

XO COMMUNICATIONS
SERVICES, INC., et al.,

       Plaintiffs,                      Case No. 2:07-cv-500
                                              JUDGE GREGORY L. FROST
     v.                                  Magistrate Judge Norah McCann King

THE OHIO BELL
TELEPHONE CO., et al.,

       Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings: a motion for summary judgment (Doc. # 21) filed by Defendant the Commissioners of the Public Utilities Commission of Ohio[1] ("PUCO"), a motion for summary judgment (Doc. # 24) filed by Defendant AT&T Ohio[2] ("AT&T"), a motion for summary judgment (Doc. # 28) filed by Plaintiffs XO Communications Services, Inc. ("XO") and NuVox Communications of Ohio, Inc. ("NuVox"), a memorandum in opposition (Doc. # 32) filed by PUCO, a memorandum in opposition (Doc. # 33) filed by AT&T, and a memorandum in opposition (Doc. # 34) filed by XO and NuVox. For the reasons that follow, the Court grants Defendants' motions for summary

---

    [1] The Complaint also names as defendants PUCO's commissioners: Alan R. Schriber, Ronda Hartman Fergus, Donald L. Mason, Valerie A. Lemmie, and Paul A. Centolella. For ease of reference, this Court shall simply use "PUCO" in referring jointly to the commission and the commissioners.

    [2] AT&T Ohio is one of several names under which the Ohio Bell Telephone Company has conducted business in Ohio. For ease of reference, this Court shall use "AT&T" throughout this opinion, regardless of what corporate name the Ohio Bell Telephone Company employed at any point in the events leading to this litigation.

judgment (Docs. # 21, 24), denies Plaintiffs' motion for summary judgment (Doc. # 28), and affirms PUCO's decision.

## I. Background

AT&T is a provider of local telephone services in the state of Ohio and, as the parties agree, meets the definition of an "incumbent local exchange carrier" ("ILEC") within the meaning of the Telecommunications Act of 1996.  *See* 47 U.S.C. § 251(h); 47 C.F.R. § 51.5. This Act provides protections against ILEC monopoly of markets and requires ILECs to enter into interconnection[3] agreements with competitors.  These interconnection agreements enable competing local exchange carriers[4] ("CLECs") to offer local exchange and exchange access services and set forth the terms and conditions by which a competitor can use an ILEC's network and purchase the ILEC's telecommunication services for a negotiated fair price.  *See* 47 U.S.C. § 251(a)(1) & (C).  The Act requires ILECs to negotiate in good faith with competitors and provides that a party can petition a state public utility commission[5] to arbitrate the interconnection agreement when the parties cannot negotiate an agreement themselves.  *See* 47 U.S.C. § 252(b)(1).

The facts underlying this litigation involve just such a dispute.  On August 21, 2003, the

---

[3] In this context, the term "interconnection" means "the linking of two networks for the mutual exchange of traffic" and "does not include the transport and termination of traffic." 47 C.F.R. § 51.5.

[4] In broad terms, a competitor local exchange carrier "is any person that is engaged in the provision of telephone exchange service or exchange access." 47 C.F.R. § 51.5.

[5] The FCC rules provide that "[a] state commission means the commission, board, or official (by whatever name designated) which under the laws of any state has regulatory jurisdiction with respect to intrastate operations of carriers." 47 C.F.R. § 51.5.  There is of course no dispute that PUCO meets this definition.

Federal Communications Commission ("FCC") issued a Triennial Review Order[6] ("TRO"), which the FCC later revised via a February 4, 2005 Triennial Review Remand Order[7] ("TRRO"). The TRRO established rules regarding when ILECs must make local circuit switching, high-capacity loops, and dedicated interoffice transport available to competing carriers. These rules set objective measures for when the number of business lines and fiber-based collocators in individual wire centers[8] permit regulators to deem a market sufficiently competitive so that a CLEC would not be impaired from operating in that market if the CLEC did not have access to an ILEC's loops and transport facilities at specially adjusted rates. If the number of business lines or fiber-based collocators[9] is below a set threshold, an ILEC's wire center is considered a source of impairment and the ILEC must provide CLECs access. Access in this context means that the ILEC must lease the CLECs high-capacity wires running to and from the wire center on an unbundled basis. If the number of business lines or fiber-based collocators is above the set threshold, however, the ILEC's wire center is not considered a source of impairment and the

---

[6] The Code of Federal Regulations provides that "[t]he Triennial Review Order means the [Federal Communication] Commission's Report and Order and Order on Remand and Further Notice of Proposed Rulemaking in CC Docket Nos. 01-338, 96-98, and 98-147." 47 C.F.R. § 51.5.

[7] The Code of Federal Regulations provides that "[t]he Triennial Review Remand Order is the [Federal Communication] Commission's Order on Remand in CC Docket Nos. 01-338 and 04-313 (released February 4, 2005)." 47 C.F.R. § 51.5.

[8] A "wire center" means "the location of an incumbent LEC local switching facility containing one or more central offices, as defined in the Appendix to part 36 of this chapter. The wire center boundaries define the area in which all customers served by a given wire center are located." 47 C.F.R. § 51.5.

[9] A "fiber-based collocator" is a carrier that is not affiliated with the ILEC, but which maintains a collocation arrangement in an incumbent LEC wire center and satisfies various express conditions discussed below. *See* 47 C.F.R. § 51.5.

3

ILEC need not provide CLECs such unbundled access. In this latter situation, a CLEC often purchases network elements that it does not need.

XO and NuVox are both CLECs that interconnect with and lease network elements[10] from AT&T. In early 2005, AT&T issued Accessible Letters asserting that various wire centers in Ohio met the TRRO tests for non-impairment. A number of CLECs that did business in Ohio objected to this characterization, including Plaintiffs. On March 4, 2005, these CLECs filed petitions with PUCO that sought declarations and orders that AT&T was required to continue providing the CLECs with unbundled network elements in these wire centers. In November 2005, XO filed a petition with PUCO that asked for an investigation of select wire centers that AT&T had characterized as non-impaired. NuVox and other CLECs intervened in that proceeding, and the parties submitted testimony and briefs on the issues.

PUCO then issued a Finding and Order on June 6, 2006, which led to a rehearing process that concluded on July 26, 2006. The end result of these proceedings was that PUCO found and adhered to its finding that a collocation-to-collocation arrangement[11] counts as a fiber-based

---

[10] A "network element" is defined as follows:

[A] facility or equipment used in the provision of a telecommunications service. Such term also includes, but is not limited to, features, functions, and capabilities that are provided by means of such facility or equipment, including but not limited to, subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service.

47 C.F.R. § 51.5.

[11] A "collocation-to-collocation arrangement" is an arrangement in which one collocated CLEC connects to another collocated CLEC in a wire center and uses that second CLEC's fiber transmission facility. The issue is whether a comparable substitute for fiber can suffice to establish such an arrangement.

collocator if the "cross-connect" wire between the two carriers has a capacity of at least DS3, even if that DS3 cross-connect is made of coaxial copper cable instead of fiber. PUCO also found that the cross-connected collocator did not have to own the fiber to which it connected, and that the interconnection agreement amendment that PUCO had previously approved does not require AT&T to provide the data underlying its wire center designations prior to XO and NuVox's self-certification of impairment in regard to that wire center. In other words, PUCO held in favor of AT&T on all of the issues underlying the litigation before this Court.

XO and NuVox seek review by this Court of PUCO's decision. The Court has jurisdiction pursuant to 47 U.S.C. § 252(e)(6), which provides for such review. The parties have fully briefed the issues involved, and the competing motions for summary judgment are ripe for disposition.

## II. Discussion

### A. Standard Involved

Although their motions are styled as motions for summary judgment, the parties agree that a 47 U.S.C. § 252(e)(6) case such as the instant case differs from the traditional Federal Rule of Civil Procedure 56(c) analysis. As the parties notes in their "appellate-style" briefing,[12] this Court must apply a specific analysis recognized by the Sixth Circuit Court of Appeals. Thus, this Court reviews questions of law and interpretation *de novo* while reviewing factual findings under the arbitrary and capricious standard of review. *See MCI Telecomm. Corp. v. Ohio Bell Telephone Co.*, 376 F.3d 539, 548 (6th Cir. 2004); *Michigan Bell Tel. Co. v. MCIMetro Access*

---

[12] The parties agreed to resolve this case on cross-motions on the PUCO record. *See* Doc. # 15, at 1-2.

5

*Trans. Serv., Inc.*, 323 F.3d 348, 354 (6th Cir. 2003). The Sixth Circuit has explained that "[t]he arbitrary and capricious standard is the most deferential standard of judicial review of agency action, upholding those outcomes supported by a reasoned explanation, based upon the evidence in the record as a whole." *Michigan Bell Tel. Co.*, 323 F.3d at 354 (citing *Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 520 (6th Cir. 1998)). Thus, a federal court "will uphold a decision 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.' " *Id.* (quoting *Killian,* 152 F.3d at 520). Reversal is not warranted unless there is a clear error of judgment on PUCO's part or a failure to consider relevant factors or aspects of the problem by PUCO. *Id.*

**B. Analysis**

*1. Counting of fiber-based collocators/collocation-to-collocation arrangements*

The parties' dispute over the counting of fiber-based collocators used to determine whether impairment exists naturally targets the meaning of "fiber-based collocator." That term is defined as

> any carrier, unaffiliated with the incumbent LEC, that maintains a collocation arrangement in an incumbent LEC wire center, with active electrical power supply, and operates a fiber-optic cable or comparable transmission facility that
>
> (1) Terminates at a collocation arrangement within the wire center;
>
> (2) Leaves the incumbent LEC wire center premises; and
>
> (3) Is owned by a party other than the incumbent LEC or any affiliate of the incumbent LEC, except as set forth in this paragraph. Dark fiber obtained from an incumbent LEC on an indefeasible right of use basis shall be treated as non-incumbent LEC fiber-optic cable. Two or more affiliated fiber-based collocators in a single wire center shall collectively be counted as a single fiber-based collocator. For purposes of this paragraph, the term affiliate is defined by 47 U.S.C. 153(1) and any relevant interpretation in this Title.

6

47 C.F.R. § 51.5. This tracks the TRRO definition. *See In the Matter of Unbundled Access to Network Elements ("TRRO")*, 20 F.C.C.R. 2533, 2593 ¶ 102 ("We define fiber-based collocation simply. For purposes of our analysis, we define fiber-based collocation as a competitive carrier collocation arrangement, with active power supply, that has a non-incumbent LEC fiber-optic cable that both terminates at the collocation facility and leaves the wire center." (footnote omitted)).

Notably, the TRRO expressly recognizes that "collocation arrangements may not literally be fiber-based." *Id.* The TRRO explains:

> For this reason, although we refer to our indicia as "fiber-based collocation," our test is actually agnostic as to the medium used to deploy an alternative transmission facility, because we find that a technologically neutral test better helps us to capture the actual and potential deployment in the marketplace than would a wireline-specific test.

*Id.* at n.295. Thus, the rules under which PUCO rendered its decision contemplated and permitted comparable transmission facilities that were not simply fiber-based arrangements.

This technologically-neutral approach led to the contested characterization of the arrangement involved here, which is comprised of three basic components that PUCO correctly describes as follows: "coaxial cable terminating at a collocation arrangement, a cross-connection between the coaxial cable and the fiber cable, and a fiber cable that leaves the wire center." (Doc. # 21, at 7.) Additionally, PUCO found that the foregoing arrangement offered the *same* level of capacity as a fixed-wireless facility. PUCO's factfinding in this regard is entitled to a degree of deference, which the Court accords.

The Court is cognizant of the argument by XO and NuVox that the maximum capacity and speed of fiber exceeds that of coaxial cable. This is by no means a bad argument and in fact

consumed a considerable amount of this Court's thinking.  But two points undercut adoption of this argument.

First, given the arrangement characteristics and the absence of a rule targeting maximum capacity (as opposed to the rule's requirement of being "comparable," which is under the TRRO rationale apparently *not* the same as being identical[13])–and because the coaxial capacity of DS3 involved here is the same as that which would be found in a qualifying fiber-only facility with a minimum DS3 transport capacity–the Court concludes that PUCO reasonably determined that the arrangement qualifies as comparable in this context.  XO and NuVox have failed to distinguish the essentially analogous arrangement situation embraced by the TRRO, which teaches that overlapping capacity can translate into being comparable.  The TRRO conclusion inherently recognizes that fixed wireless may not possess the same maximum utilization of fiber, but they can be comparable because they can have the same or overlapping capacity (via the same starting or minimum capacity of DS3, but that is not to say that minimum capacity must be the same; coaxial can reach the status of being comparable, even if it is not always so).  This same line of thought undercuts Plaintiffs' argument that the FCC has targeted the *typical* capacity of fiber as the test for assessing a wire center.  That inference adds more to the TRRO than the TRRO expressly provides.  The focus of the TRRO test not only captures the potential deployment in the marketplace of any technology involved, but also the *actual* deployment.  *See TRRO*, 20 F.C.C.R. 2533, n.295.

---

[13] The arrangement approved in the TRRO does not equal fiber in all respects, which means that "comparable" here must mean similar or equivalent in a shared aspect as opposed to conforming in every respect.  "Having features in common with something else to enable comparison"–in other words, having a common capacity (i.e., DS3)–is therefore apparently the most appropriate meaning in this context.

Second, the Court declines to accept the major premise Plaintiffs assert.  Relying on an inference, XO and NuVox posit that "[t]he 'technologically-agnostic' test adopted by the FCC was obviously adopted to allow for further advances in technology which will prove to be more capable than fiber–not to allow for regression back to the low level of capacity provided by coaxial cable."  (Doc. # 34, at 5.)  There is nothing in the TRRO text that indicates such a dedicated forward-looking-only concern, however.  Rather, the broad nature of the TRRO definition can be read to fairly and reasonably encompass advancements while concurrently encompassing less sophisticated technology utilized in such a manner as to achieve a comparable level of operation so as to meet the requisite test.  XO and NuVox ask this Court to read into federal law a limitation that is not there, based on assumptions, without crediting the scope of the language the FCC has elected to employ and the freedom of PUCO to render a decision that falls fairly within that language.

The Court recognizes that XO and NuVox have pointed to contrary decisions by other state commissions.  This initially gave the Court pause, but three factors have led this Court to conclude that these non-binding decisions cannot control here.  First, the Court can discern no basis to conclude that PUCO's factfinding was arbitrary or capricious.  Second, upon *de novo* review, the Court has come to the conclusion that it agrees with PUCO's reading of the applicable TRRO provisions and related rules.  Applying this Court's understanding of the substantive provisions involved to the facts as reasonably found by PUCO, the Court reaches the same ultimate decision as PUCO.  To conclude otherwise, with all due respect to the entities behind the contrary decisions mentioned above, would be to limit the scope of the definitions and rules involved without a textual basis for doing so; it would, in effect, unduly limit or

9

arguably read out of the rule's definition the term "comparable" without cause for such forced (mis)construction.[14]  Third, the Court recognizes that, as PUCO asserts, reaching the contrary result in this case would indeed constitute second-guessing a state commission that is in the best position to apply the rules and guidelines within the context of the specific market where applying the permissible, within-the-scope broader understanding may be appropriate and necessary.  Fair competition requires fairness to all the parties involved.

This leaves the second issue relating to PUCO's counting determinations: whether the state commission erred in holding that an ILEC can count carriers that lease fiber meeting the minimum transmission capacity from another CLEC rather than from the ILEC.  The Court concludes that Defendants are also entitled to judgment on this issue.

PUCO found as fact that the collocators involved–i.e., those that leased fiber from another collocator–offered the same amount of control over the facility as the arrangement credited in the TRRO, which recognized that the collocation arrangement may be obtained through less traditional collocation arrangements that nonetheless qualify as comparable collocator arrangements.[15]  *See* 20 F.C.C.R. at 2593 ¶ 102 (referencing Verizon's CATT fiber

---

[14]  AT&T argues that fully crediting the rejected testimony of Joseph Gillan, Plaintiffs' witness, would by logical extension mean that "the only facility that could be 'comparable' to fiber would be another fiber facility." (Doc. # 33, at 7.)  Such a result would indeed "render the 'comparable' concept meaningless." (*Id.*)  But even a less stringent and perhaps more accurate view of this testimony leads back into the comparable-means-future-technology argument, which the Court has already rejected as an inference built on speculation as opposed to a reasonable inference drawn from the language of the TRRO itself.  Neither PUCCO nor this Court need credit mindreading.

[15]  The Court notes that, in making its factual findings, PUCO apparently credited the testimony of AT&T witness Marvin Nevels while declining to credit the testimony of Plaintiffs' witness Joseph Gillan.  This is notable because it directly informs two critical issues.
First, the factfinding speaks to *how* the arrangements are regarded as operating.  Where

10

termination arrangements).  To support its conclusion, PUCO relies on the rule-based definition of "fiber-based collocator," which precludes ownership by an incumbent ILEC, but accepts ownership "by a party other than the incumbent LEC or any affiliate of the incumbent LEC" (subject to an inapplicable exception for dark fiber[16] obtained from an incumbent ILEC on an indefeasible right of use basis).  *See* 47 C.F.R. § 51.5.  Such reliance is correct, because nothing in the definition addresses when a CLEC leases fiber from another CLEC; there is no prohibition in the specific provision of the rule that would throw such a situation out of the scope of the definition.[17]  And by specifically precluding ILEC ownership or affiliation while concurrently

---

the coaxial cable leaves and terminates is invariably tied to the factfinding to which this Court owes due deference.
      Second, the factfinding targets the related issue of control, or stated in the words of the applicable rule, the issue of *what* entity "operates" the fiber-optic cable or comparable transmission facility.  *See* 47 C.F.R. § 51.5.  It is significant that the rule unfortunately fails to define "operate," just as it curiously fails to define "comparable."  PUCO essentially filled in the gap, in part by crediting the multi-pronged testimony of Nevels.  Plaintiffs' definition of operate, which basically turns on lighting, is unduly narrow without a textual basis endorsing the restrictive construction they offered before PUCO and urge this Court to accept.  Absent unduly imputing such a narrowing meaning to "operate," Plaintiffs' argument that what occurs in the arrangement seen here is merely piggybacking and not operating is without sufficient support to carry the day.  The less-restrictive definition of operate also bolsters PUCO's reliance on the TRRO Verizon CATT arrangement.  And PUCO's factfinding as to how the arrangement at issue operates comports with its interpretation of federal law; the TRRO neither does not state that supplying optronics equals operating.
      There is no basis for rejecting PUCO's factfinding here, and that factfinding pervades much of the legal issues involved in this case.

     [16]  The TRRO explains that "dark fiber is fiber optic cable that has been deployed by a carrier but has not yet been activated through connections to optronics that 'light' it, and thereby render it capable of carrying communications."  20 F.C.C.R. at 2607 ¶ 133.

     [17]  The post-TRO absence of an ownership or indefeasible right of use requirement renders some of the contrary analysis from other state commissions of limited value.  As AT&T notes, the approved arrangement in the TRRO featured use but not ownership.  (Doc. # 33, at 15.)  Of the two most notable other state commission decisions upon which Plaintiffs rely, the Texas decision is most confounding because it contains less analysis.  That state commission injects a "directly connected to" requirement into the definition that is simply not there.

remaining silent as to similar CLEC ownership, the rule leaves open an avenue that PUCO was left to find permissible.[18]

The Court regards this text-based analysis as more persuasive than the policy argument advanced as another ground for upholding PUCO's decision. PUCO argues that accepting the more limiting construction of XO and NuVox would "deter innovative arrangements and lead to the unnecessary duplication of facilities." (Doc. # 32, at 6.) This is a policy decision that is beyond the purview of this Court's review, however. The Court is not concerned so much with what would be the best policy as it is with simply what the existing rules are. Thus, the Court declines to credit the policy-based rationale for upholding PUCO's decision.

Finally, this Court qualifies its decision today by again noting the fact-dependent nature of much of the analysis. The Court is not holding that all CLEC collocation-to-collocation arrangements invariably qualify as comparable transmission facilities so as to make a carrier a fiber-based collocator susceptible to the count involved here. Rather, the Court is simply

---

Similarly, Texas focuses not on overlapping or common transmission capacity but on the greater capacity and speed of fiber, thereby treating comparable to mean more than containing common capacity. The Michigan commission decision and the federal court decision also fail to prove dispositive here primarily because both rely on ignoring the term "comparable" in favor of erroneously *mandating* the involvement of fiber. *See Michigan Bell Tel. Co., Inc. v. Park*, No. 06-12374, 2007 WL 1343691, at *6 (E.D. Mich. May 8, 2007). Moreover, the PUCO findings geared toward operating in the instant case appear to distinguish the findings related to operation involved in the Michigan proceedings, where mere use was found. *See id.*

[18] The Court also recognizes that Plaintiffs' reliance on the dark fiber-related provisions of the TRO unduly credits what is not said more than what is said. *See* Doc. # 28, at 18-19; Doc. # 34, at 9. The TRO (and by the noted incorporation, the TRRO) explains how to count in situations involving the acquisition of dark fiber, but that specificity does not foreclose counting in lit fiber situations; the TRO wording simply notes that the acquiring company has obtained *only* dark fiber and not *both* dark and lit fiber. Paragraph 102 of the TRRO points to a broader range of arrangements that can be counted.

concluding that under the specific facts found here and in light of the substantive rules involved, there is no basis for disturbing PUCO's determinations in this limited context.

### 2. *Access to data prior to self-certification*

Under the TRRO, an ILEC such as AT&T performs a count of fiber-based collocators and business lines at a wire center and designates that wire center as either impaired or non-impaired. The designation is then provided to CLECs such as XO and NuVox that seek to access elements of the wire center. The TRRO requires that if a CLEC wants to challenge the ILEC's designation of a wire center as impaired, then the CLEC must undergo self-certification. This means that the CLEC must first conduct a reasonably diligent inquiry and then certify that, to the best of its knowledge, its request is consistent with the TRRO. The CLEC can thereafter obtain unbundled access to the network elements it seeks, while the ILEC can challenge the self-certification before the state commission.

The final dispute before this Court involves when AT&T had to disclose the data upon which it relied in making the disputed designations. In the proceedings below, PUCO determined that a prior approved "interconnection agreement amendment . . . specifically establishes the process to be utilized for the purpose of identifying when the nonimpairment criteria has been satisfied." (Doc. # 2-2, at 30.) PUCO explained that the voluntarily agreed-upon terms of the approved agreement provided that AT&T did not have to provide the underlying data with its non-impaired wire center designations and that the agreement provided for disclosure only following self-certification. PUCO also noted that AT&T would provide such data following self-certification pursuant to a protective order.

The parties disagree over whether PUCO properly determined that CLECs could not have

access prior to self-certification to the ILEC data underlying AT&T's wire center designations. Pointing to state utility commission decisions in Michigan and Texas favoring their position, XO and NuVox argue that PUCO's denial of access to this data was arbitrary and capricious.

This Court disagrees. XO and NuVox have failed to direct the Court to any TRO or TRRO provision that mandates disclosure of an ILEC's underlying data prior to self-certification, while the interconnection agreement amendment indeed contemplates disclosure of the underlying data *following* CLEC self-certification. As PUCO correctly recognized, § 4.1.1 of the amended agreement does not require AT&T to provide underlying data *with* its designation of non-impaired wire centers or *before* CLEC self-certification. (Doc. # 2-30, TRO/TRRO Amendment at 14, 15.) Rather, §§ 4.1.3 and 4.1.4 present a process in which *following* CLEC self-certification, AT&T (protected by a protective order and filing under seal as warranted) provides all data upon which it intends to rely in disputing a CLEC self-certification. (Doc. # 2-30, TRO/TRRO Amendment at 15, 16.)

Interpretation of the amended agreement thus presents an instance where silence essentially equates to "the dog that did not bark." *See Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) (citing A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927)). Under this maxim of construction, silence directs against finding that such a fundamental duty as earlier disclosure exists.

Here, the amended agreement expressly provided for disclosure of an ILEC's underlying designation data following CLEC self-certification. The negotiated agreement could but did not indicate a specific, clear intent for an ILEC to provide the data upon which it relied in making its designations prior to CLEC self-certification. Thus, the inclusion of an express timed disclosure

14

and silence as to any mandated earlier disclosure evinces an intent favoring no required disclosure prior to self-certification. If such earlier disclosure were intended, the express provision mandating subsequent disclosure would be both unnecessary and awkwardly phrased. For example, the amended agreement provides:

> In the event of a dispute *following* CLEC's Self-Certification, upon request by the Commission or CLEC, [AT&T] will make available, subject to the appropriate state or federal protective order, and other reasonable safeguards, all documentation and all data upon which [AT&T] intends to rely, which will include the detailed business line information for the [AT&T] wire center or centers that are the subject of the dispute.

(Doc. # 2-30, TRO/TRRO Amendment at 16 (emphasis added).) If this Court were to credit the argument of XO and NuVox, the Court would have to read the word "following" out of the section quoted above, which would do damage to the approved agreement language. It would also render the section unnecessary, which in turn would mean that an agreed-upon provision approved by PUCO was curiously and unlikely inserted without cause or purpose. Moreover, ignoring "following" would not only make the sentence ungrammatical, but would also impute to AT&T an uncertain responsibility of disclosure. Until self-certification an ILEC would rarely if ever have knowledge of a self-certification *dispute*–the triggering event in the foregoing agreement passage. A likelihood or mere possibility of a dispute can hardly be said to be "the event of a dispute." The expression of a duty to later disclose therefore logically and necessarily informs the debate as to whether the earlier duty to disclose exists.

The fact that the state utility commissions in Michigan and Texas issued arbitration awards contemplating pre-CLEC self-certification of ILEC data does not prove dispositive or even persuasive here. (R. at 21, at 20-21 & Ex. 1.) The Court has reviewed the language of both state decisions at length and has concluded that they are readily distinguishable. Neither

decision involved an interconnection agreement such as the one involved here and discussed above, which notably sets both expressly and by clear implication disclosure procedures tied to specific timing and events. The Court also notes that neither the Michigan nor the Texas decisions based their mandated earlier disclosures on TRO/TRRO language. Thus, XO and NuVox are essentially using other states' decisions involving different agreements to make a policy argument that would invalidate a portion of the approved agreement involved here. But, again, today's inquiry is not concerned with making policy, but simply with whether PUCO acted arbitrarily or capriciously in rendering its decision.

In light of the foregoing, the Court cannot say that PUCO's decision in regard to the underlying data was either arbitrary or capricious. The state commission simply gave life to the amended agreement and declined to write into the agreement or the TRO/TRRO that which is not there. In so doing, PUCO examined the relevant data–i.e., the amended interconnection agreement–and articulated a satisfactory explanation for its decision that included a rational connection between the facts found and the choice the state commission made.

The Court recognizes that CLECs such as XO and NuVox might feel that delayed disclosure places them at a disadvantage. Plaintiffs' argument imputes to them a greater burden than they have and then claims that this greater burden requires more of AT&T. Ultimately, however, the end result of the agreed procedure approved by PUCO is that a CLEC's reasonably diligent inquiry is simply qualified by the amount and nature of the information that CLEC has available to it. Because reasonable diligence in this case does not include examination of data to which the CLEC does not yet have access, the burden of the scope of the requisite investigation on the CLEC is inherently lessened at the earlier stage. The FCC itself in fact recognized the

qualified nature of the reasonably diligent inquiry, stating that a CLEC self-certify "to the best of its knowledge." *TRRO*, 20 F.C.C.R. at 2665 ¶ 234. The FCC additionally explained that "the requesting carrier seeking access to the [unbundled network element] certifies only to the best of its knowledge, and is unlikely to have in its possession all information necessary to evaluate whether the network element meets the factual impairment criteria in our rules." *Id.* at 2669 n.659. The FCC therefore contemplated that a CLEC's inquiry would thus be constrained by the information available to that CLEC.

Disclosure following self-certification does not place a CLEC at a disadvantage overall, because if an ILEC seeks to defend its designations, it will disclose the data under a protective order, thereby leveling the playing field. Although another procedure might have been adopted, the Court, like PUCO, will credit the process actually agreed upon and approved even if it is arguably less than optimal.

The Court therefore concludes that XO and NuVox's final ground of complaint presents no cause for overturning PUCO's decision and that summary judgment in favor of AT&T is warranted on this issue.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motions for summary judgment (Docs. # 21, 24) and **DENIES** Plaintiffs' motion for summary judgment (Doc. # 28). The Court therefore **AFFIRMS** PUCO's decision.  The Clerk shall enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division, at Columbus.

**IT IS SO ORDERED**.

                                            /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE